[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a suit for dissolution of marriage brought by the plaintiff husband against the defendant wife. The action was commenced on May 5, 1997. The defendant has filed a cross-complaint in which she also seeks a decree of dissolution of marriage. The matter came on to be heard before the undersigned having been referred by the Honorable Myron Ballen, Presiding Judge, Family.
The parties were married on June 28, 1990, at White Plains, Westchester County, New York. This is the second marriage for each of the parties. There are no children issue of the marriage; however, the plaintiff has four children of his prior marriage and the defendant has one child of her prior marriage. CT Page 10327
The end of April, 1997, the plaintiff advised the defendant he no longer wished to be married and wished a divorce. They have been living in separate parts of their Greenwich home since that date.
The plaintiff is 57 years of age and in good health. He is a graduate of Union College with a B.A. degree. He resides in Greenwich in a home which he purchased in June, 1990 and conveyed to the defendant in September, 1990. Prior to their marriage, he owned a condominium in Palm Beach, Florida, which, after the marriage, he also conveyed to the defendant. He spends as much time as he can, now, at the condominium in Palm Beach. He is employed by Equitable Holdings Corporation, a family holding company. The plaintiff started with the company in 1970 and was subsequently joined by his brother. He is Vice President and a co-trustee of the trust under his father's will. His annual salary at Equitable Holdings is $135,000 and he receives annual trust income of $837,000. These are gross figures.
The office of Equitable Holdings Corporation is located in New York City, so that plaintiff's salary is subject to New York City, New York State and federal taxes. The plaintiff's trust income is subject to Connecticut and federal taxes. His total average monthly net income as reported in his financial affidavit is $52,964. At the time of his marriage in 1990, his income was substantially less. At that time, he received the trust income reported in I B i of his financial affidavit. That reported in I B ii, iii, iv and v he received after his mother's death in December, 1994.
The defendant is 52 years of age and also in general good health. She graduated from Athens College in Alabama in 1971 or 1972 with a Bachelor of Science degree in Education. She was married previously, divorced in 1972 and has a son 32 years of age. In 1984, she was employed as a restaurant critic for the Miami Herald and by Whittle Publishing, a company targeting the college market for sampling and advertising. At that time she lived in Palm Beach. The parties met at a party in 1985 in Palm Beach. In October, 1988, she was hired by Dan Schneider of Collegiate Marketing and Communications (CMC) and became publisher and Executive Vice President of its magazine, also geared to the college market and in competition with Whittle. At the time of her leaving this position in June, 1990, her annual base salary was $115,000 and her commissions earned for 1990 up to June 15th amounted to $48,000. She expected commissions of CT Page 10328 $50,000-$60,000 for the remaining six month period. She was 42 years of age at the time and her job required some travel. Most meetings were in the New York, New Jersey area. She terminated her position with CMC on June 15, 1990, immediately prior to her marriage to the plaintiff.
Immediately prior to the private marriage ceremony in this case, the parties executed a prenuptial agreement. The plaintiff maintains that this was requested by the defendant so that she would have the assurance that she would be taken care of for the rest of her life. That agreement in its initial form provided that the defendant would have transferred to her name the Palm Beach condominium and the home in Greenwich and was executed on January 29, 1990 (plaintiff's exhibit E). However, what the plaintiff contemplated as the home was a $500,000 to $750, 000 home with no mortgage. Later, the parties became interested in a home the plaintiff hoped to purchase for $750,000 to $1,000,000.
On June 25, 1990, the parties executed a second antenuptial agreement (plaintiff's exhibit G). That antenuptial agreement also provided that the plaintiff would purchase a home to be chosen by the defendant and cause that home to be deeded to her to be her sole property. It also provided that the condominium at Palm Beach, Florida, shall become her property. The home chosen by the defendant was that at 521 Riversville Road, Greenwich, the home presently occupied by the parties, although with closed and padlocked doors between them. Both properties, by the terms of the antenuptial agreement would have passed to the defendant's son or passed under her will. The agreement also provided that the plaintiff would convey all of his property if he ever resumed drinking, was guilty of infidelity or cruel and inhumane treatment. Expressed as a hope in the agreement was that the parties' five children (the plaintiff's four and the defendant's one) might be treated as equals in the event of the demise of both plaintiff and defendant, but this required estate planning by both parties so that the children would end up with shares of principal as equal as possible.
In this jurisdiction, antenuptial agreements are not entitled to automatic recognition or enforcement in a dissolution proceeding. Effective October 1, 1995, all prenuptial or antenuptial agreements executed thereafter are subject to the provisions of Connecticut Premarital Agreement Act, §46b-36a-j of the General Statutes. The agreement in this case was entered into in 1990 and therefore is not covered by this CT Page 10329 statute. The parties are, therefore, subject to the common law of this state on the issue of validity. That common law is set forth in the case of McHugh v. McHugh, 181 Conn. 482 at 485 (1980). The Supreme Court in McHugh has set forth a three-pronged test for determining the validity and enforceability of such agreements. The court stated as follows:
 "The validity of an antenuptial contract depends upon the circumstances of the particular case. [Citation omitted.] Antenuptial agreements relating to the property of the parties, or more specifically, to the rights of the parties to that property upon the dissolution of marriage, are generally enforceable where three conditions are satisfied: (1) the contract was validly entered into; (2) its terms do not violate statute or public policy; and (3) the circumstances of the parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice. [Citations omitted.]
 "An antenuptial agreement is a type of contract and must, therefore, comply with ordinary principles of contract law. [Citations omitted.] To determine whether an antenuptial agreement relating to property was valid when made, courts will inquire whether any waiver of statutory or common law rights or the right to a judicial determination, in any matter, was voluntary and knowing. [Citations omitted.] The duty of each party to disclose the amount, character and value of individually owned property, absent the other's independent knowledge of the same, is an essential prerequisite to a valid antenuptial agreement containing a waiver of property rights. [Citations omitted.] The burden is not on each to inquire, but on each to inform for it's only by requiring full disclosure of the amount, character and value of the parties' respective assets that courts can assure intelligent waiver of the statutory rights involved. [Citation omitted.] . . . Other factors that bear upon the validity of such contracts include which party drafted the agreement, by counsel or otherwise, and whether the parties were represented by counsel."
 "We stated in Sacksell that on principle there appears CT Page 10330 to be no good reason why such an agreement if fairly made and entered into, by a person of full age, for adequate consideration received, should not be binding upon him. Sacksell v. Bennett, 132 Conn. 139, 145
(1945).
 "Finally, an antenuptial agreement will not be enforced where the circumstances of the parties at the time of the dissolution are so far beyond the contemplation of the parties at the time the agreement was made as to make enforcement of the agreement work an injustice. [Citations omitted.] . . . where the economic status of parties has changed dramatically between the date of the agreement and the dissolution, literal enforcement of the agreement may work injustices. Absent such unusual circumstances, however, antenuptial agreements freely and fairly entered into will be honored and enforced by the courts as written." McHugh v. McHugh, 181 Conn. 482, 486-489 (1980).
The antenuptial agreements of January 29 and June 25 were both drafted by the defendant's brother, a lawyer in Tennessee. He was purportedly acting on behalf of both parties. Neither party sought other counsel. There was no financial disclosure by the defendant prior to the execution of the agreement and no disclosure in writing by either party. Thereafter, the plaintiff took the agreement to New York City where it was notarized by Patricia Ross. The defendant did not appear in New York City before Ms. Ross, the notary public.
The agreement of June 25 was executed in the Riversville Road house before the parties had purchased the same. On June 28, 1990, the parties were married in Judge Emanuel's chambers in White Plains, New York, in the presence of the judge's law clerk and secretary. On June 29th, plaintiff closed on the purchase of 521 Riversville Road, Greenwich.
The antenuptial agreement was the defendant's idea. The plaintiff felt pressured into signing the agreement. While not coerced, he realized that unless he signed the agreement, the defendant would not marry him.
The agreement of June 25 was not freely and fairly entered into. The agreement of June 25th was and not fair and equitable at the time of execution. It was, also, not fair and equitable at CT Page 10331 the time of dissolution. So much of the agreement as provides that the plaintiff shall never seek a divorce may make the agreement void as against public policy. In any event, the agreement does not satisfy the third prong of the test set forth in McHugh and the court rules it invalid.
The defendant has argued that if the agreement of June 25th is found to be invalid then the agreement of January 29th should control. The court finds that agreement also to be unfair and inequitable at this time and likewise invalid.
Each of the parties have argued the rule of law regarding these two antenuptial agreements. Defendant argues that they are New York contracts. Plaintiff argues that they are Connecticut contracts and, if they are New York contracts, the defendant has not complied with the Practice Book Rules by offering evidence of New York law. All of this makes little difference in the court's analysis since this is a Connecticut dissolution proceeding and this court must determine the fairness of the antenuptial agreements if their terms are to be applied in the dissolution proceeding. Both agreements are not fair and equitable and shall not be applied in this proceeding.
The marriage of the parties has broken down irretrievably. The plaintiff attributed six reasons for this:
1. The defendant would not participate in estate planning as provided in the antenuptial agreement. He says he asked her in 1990, 1991, 1992, 1993, 1994, 1995 and 1996. Her response on each occasion that estate planning was mentioned: "I don't want to talk about it."
2. Every month there was a negative cash flow because they were spending more than what was coming in.
3. The defendant was trying to get him to enjoy her friends and not his friends.
4. The defendant was constantly asking him to find a husband for her sister.
5. The defendant fairly always was seeking something for the Heffington family.
6. The defendant had no relationship with his children.
CT Page 10332
In September, 1987, the plaintiff fell and struck his head. He was hospitalized for two months at Columbia Presbyterian Hospital, and then recovered at Burke Rehabilitation Center. He suffered serious brain injury, losing 43% of his brain capacity. Following his release from Burke Rehabilitation Center, he resided with his mother in Rye, New York. He was living at home with his mother when he and the defendant were married. The plaintiff testified he was not fully recuperated today from this injury. Otherwise he is in good health.
As to defendant's health, she testified she had a rotator cuff injury of the left shoulder and a torn ligament in the foot, but was otherwise in good health.
Prior to the marriage, the plaintiff had assets of $4,200,000, of this amount, $3,400,000 consisted of cash and equivalents and marketable securities. of this amount, $3,000,000 was liquidated to purchase 521 Riversville Road in Greenwich, $2,100,000 as a down payment and the balance to pay the capital gains tax. A mortgage slightly under $1,000,000 was obtained to meet the purchase price of $3,100,000, of the remaining amount of $800,000, $388,000 represented the value of the condominium in Palm Beach and $432,000 represented the value of his retirement account. Since the marriage, there has been an increase in net worth of $788,000 consisting of $530,000 inherited from his mother's estate and $552,899 in net appreciation of Riversville Road and $525,000 in net appreciation and additional contributions to his profit sharing plan, less $640,000 in federal income tax and spending in excess of income prior to 1994.
During all of this period, the defendant contributed very little to the preservation or appreciation in value of their respective estates. Her sole contribution was painting and decorating a second condominium owned by the plaintiff with his sister in Palm Beach and one of the cottages on the Greenwich property.
The defendant had assets prior to the marriage consisting of an equitable interest in Collegiate Marketing and Communications, Inc., a one-half interest with her father in an unimproved lot in Lawrenceburg, Tennessee valued at $109,500, furniture valued at $30,000, jewelry valued at $20,000-$30,000, cash or equivalent of $30,000, an IRA valued at $6,000 and a mortgage interest in CT Page 10333 property in Tennessee, which she subsequently repossessed on default, the indebtedness of $40,000 paid off by the plaintiff and which property she conveyed to her son. Her property presently consists of the real property in Lawrenceburg; a certificate of deposit in Community Bank Trust in Tennessee valued at $65,000; jewelry which the plaintiff values at $400,000 but which she values at $100,000 at a "sale value"; a 1989 BMW' valued at $6,000, the Greenwich and Palm Beach properties valued at $3,000,000 net of the mortgage, selling expenses, and taxes; and furniture presumably still valued at $30,000. Without the Greenwich and Palm Beach property, the total value of her assets would be $310,500 with jewelry valued at $100,000 or $610,500 with jewelry valued at $400,000.
The defendant has claimed loss of her equity interest in Collegiate Marketing and Communications, Inc. This equity interest stems from her employment contract upon her beginning work there in October, 1988. (See plaintiff's exhibit R.) In that letter agreement, it is recited that she would receive a minimum equity share of 2.5% upon beginning employment. The letter also states that her interest would be "subject to the same terms and conditions" that the owner's interest is subject to. There has been no evidence of those terms and conditions. The letter agreement also states that in the event she is no longer employed by the company, the company will buy back her shares. She resigned from the company in June, 1990. She never received any stock in Collegiate Marketing and Communications, Inc. so there were no shares to buy back. Dan Snyder, President of Collegiate Marketing and Communications, Inc., subsequently changed the name to Snyder Communications Corporation, which title became Schneider Marketing Services, Inc., a publicly traded corporation with public offerings in 1997 and 1998.
Stephen G. Ryan, Professor of Economics at New York University, testified such an interest today would be worth $13,700,000. However, such interest that the defendant might have had was "subject to the same terms and conditions" as Mr. Snyder's interest. Whether defendant's interest would have remained is a matter of conjecture since her interest was to last only so long as she remained in the employ of the company.
The court finds this evidence to be too speculative and uncertain and not of sufficient probative value to be considered as a factor in determining a fair and equitable assignment of property pursuant to § 46b-81 of the General Statutes. CT Page 10334
Since the antenuptial agreements are ruled invalid, the court must now consider what property assignment and alimony award is fair and equitable. Our Supreme Court has held in numerous cases that the purpose of alimony is to continue the duty to support a spouse. Blake v. Blake, 211 Conn. 485, 498 (1989). Although no statutory factor is preferred under § 46b-82, the current financial needs and circumstances of both parties are highly significant in determining financial awards. Leveston v.Leveston, 182 Conn. 19, 22 (1980); Valente v. Valente,180 Conn. 528, 530 (1980).
The defendant, before the marriage, was self-sufficient and self-supporting. She should be able to return to an executive position. As already noted, she has a college education and extensive business experience. She is also attractive and highly intelligent. She needs time to adjust and to rehabilitate herself. This is a case for time limited alimony to provide an incentive for her to procure employment and for rehabilitative purposes. Ippolitto v. Ippolitto, 28 Conn. App. 745, 752 (1992).
The expenses in the defendant's financial affidavit are those geared to her present situation in a large home in Greenwich. Her expenses for health and beauty care of $15,600 per year, car insurance of $15,600 per year, and floral expenses of $4,200 per year are all excessive. Such expenses will certainly not be incurred once she is no longer living in the Greenwich home. Not that she should not continue to live in handsome style until she can adjust to her new life, but expenses as set forth in her financial affidavit will no longer be necessary or appropriate.
In considering the issue of alimony, more particularly the amount and duration, the following has been stated by our Supreme Court:
 To begin with, our alimony statute does not recognize an absolute right to alimony, General Statutes § 46b-82; Thomas v. Thomas, 159 Conn. 477, 487, 271 A.2d 42
(1970); `This court has reiterated time and again that awards of financial settlement ancillary to a marital dissolution rest in the sound discretion of the trial court.' (Citation omitted.) Although the court is required to consider the statutory criteria of length of marriage, causes for dissolution, the age, health, station in life, occupation, amount and sources of CT Page 10335 income, assets and opportunity for future acquisitions of assets of each of the parties, (citation omitted), no single criterion is preferred over all the others. In weighing the factors in a given case, the court is not required to give equal weight to each of the specified items. Nevertheless, it is rather obvious that in making financial determinations, the financial circumstances, both actual and potential, are entitled to great weight. Valente v. Valente, 180 Conn. 528, 530 (1980); Watson v. Watson, 221 Conn. 698, 710
(1992).
The court has considered all of the factors of § 46b-82
of the General Statutes recited above and considered, too, the standard of living to which the defendant has become entitled.
With regard to an assignment of property, it has been said by our Appellate Court in the case of Emanuelson v. Emanuelson,26 Conn. App. 527, 530, 531 (1992):
 "General Statutes § 46b-81(c) requires the trial court to evaluate certain factors before distributing the parties' assets in a marital dissolution action. Although the court must evaluate all the factors listed, it has broad discretion when applying the statutory factors to assign the parties' assets. O'Neill v. O'Neill, 13 Conn. App. 300, 312, 536 A.2d 978, cert. denied 207 Conn. 806, 540 A.2d 374
(1988). . . .
 The statutory factors for determining alimony in § 46b-82 are identical to the factors used to distribute property in § 46b-81(c)."
The court has considered all of the criteria of §§ 46b-81
of the General Statutes together with all of the evidence and the case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account, " Scherr v. Scherr,183 Conn. 366, 368 (1981), this court will not recount those statutory criteria and the evidence, other than as has been previously stated. "The court is not obligated to make express findings on each of these statutory criteria." Weiman v. Weiman,188 Conn. 232, 234 (1982). CT Page 10336
Suffice it to say that the court must consider all the statutory criteria in determining how to divide the parties' property in a dissolution proceeding, Leo v. Leo, 197 Conn. 1, 5
(1985), and that the court need not give equal weight to each factor. Kane v. Parry, 24 Conn. App. 307, 313-14 (1991).
With regard to the issue of counsel fees, such fees are properly allowable under the provisions of § 46b-62 of the General Statutes. Defendant's counsel has presented an affidavit of services performed for the defendant. This affidavit claims services performed and to be performed in an amount of $95,000 after crediting a retainer of $15,000. Defendant's counsel came into this case when the matter was already on the trial calendar. Between February and June, 1998, counsel had to bring on and defend various motions, conduct and complete discovery and, in all respects, prepare the case for trial. In addition, there is a claim for counsel fees by Attorney Amendola, predecessor counsel for the defendant.
As required by § 46b-62 of the statutes, the court has considered the factors of § 46b-82 in connection with this issue also in making a determination in this regard. In considering this issue, the court is mindful of the assignment of significant liquid funds to the defendant. The defendant will owe counsel fees in excess of any award the court will make in this case. To require the defendant to pay all of her counsel fees from the assignment of property made herein would upset the court's "carefully crafted mosaic."
The court, in addition to the foregoing findings, finds as follows:
1. There is the requisite jurisdiction.
2. The allegations of the complaint have been proved and are true.
3. There has been an irretrievable breakdown of the marriage.
4. The defendant is at fault for the breakdown of the marriage.
5. The agreements of January 25, 1990 and June 28, 1990 are not fair and equitable and are ruled to be invalid.
The court enters the following orders: CT Page 10337
1. A decree of dissolution of marriage shall enter on the grounds of irretrievable breakdown of the marriage, which decree shall enter on the plaintiff's complaint. The defendant's cross complaint is dismissed.
2. The property at 521 Riversville Road in Greenwich, Connecticut, shall be assigned to the plaintiff pursuant to the provisions of § 46b-81(a) and (b) of the General Statutes, subject to the existing encumbrances.
3. The property at 315 South Lake Drive in Palm Beach, Florida, shall be conveyed by appropriate quit claim deed by the defendant to the plaintiff, conveying all of her right, title and interest in such property to the plaintiff subject to the existing encumbrances, if any, which conveyance shall be made within thirty (30) days of the date hereof.
4. The plaintiff shall indemnify and hold harmless the defendant from any and all liability associated with the 521 Riversville Road property in Greenwich and the 315 South Lake Drive property in Palm Beach, Florida.
5. The defendant shall vacate the 521 Riversville Road property on or before November 1, 1998, at which time the current orders of alimony pendente lite shall terminate and the orders herein for permanent periodic alimony shall commence.
6. The plaintiff shall pay to the defendant the sum of $250,000 in cash on or before October 1, 1998. The plaintiff shall pay to the defendant the sum of $500,000 in cash on or before January 1, 1999. The plaintiff shall pay to the defendant the additional sum of $250,000 on or before March 1, 1999.
7. In addition to the foregoing, the plaintiff shall transfer to an account for the defendant the sum of $350,000 from his interest in the Equitable Holdings Corporation Profit Sharing Plan. Said transfer shall be accomplished by the execution of a Qualified Domestic Relations Order, which shall be prepared by plaintiff's counsel. The court shall reserve jurisdiction to effectuate said Qualified Domestic Relations Order.
8. The tangible personal property which belonged to the CT Page 10338 plaintiff prior to his marriage to the defendant at 521 Riversville Road in Greenwich and at 315 South Shore Drive in Palm Beach shall remain the plaintiff's property free of any claim or demand by the defendant. The tangible personal property at 521 Riverside Road in Greenwich purchased from the previous owners at the time of purchase of the property shall be the property of the plaintiff free of any claim or demand by the defendant. All decorative items (excluding any items of art) and window treatments including those bought for decorative purposes at the Greenwich property shall be the plaintiff's free of any claim or demand by the defendant.
9. Those items of tangible personal property belonging to the defendant prior to her marriage to the plaintiff shall be hers free of any claim or demand by the plaintiff. Those items of tangible personal property purchased by the parties since their marriage and located in Palm Beach and in Greenwich, except for those decorative items mentioned in 8 above and except for any personal items of the either plaintiff or defendant, shall be the property of the defendant free of any claim or demand by the plaintiff. Should there be any dispute or disagreement between the parties regarding this tangible property division, such dispute or disagreement shall be referred to Family Relations for resolution. Failing resolution before a counselor or counselors of the Family Relations Division, the parties shall return to court for further orders.
10. Except as set forth above, the defendant shall retain such other assets that are currently in her name including her jewelry, individual bank accounts and the real property she owns in Tennessee.
11. During his lifetime, the plaintiff shall pay to the defendant periodic alimony of $10,000 per month for a period of five (5) years commencing November 1, 1998. Said alimony shall sooner terminate upon the death or remarriage of the defendant. Except upon presentation of evidence pursuant to the provisions of § 46b-86(b) of the General Statutes such that the alimony should be modified, suspended, reduced or terminated, the amount and term of said alimony shall be non-modifiable by either party for any reason.
12. The plaintiff shall cooperate with the defendant so that she CT Page 10339 may have continued medical insurance coverage under his presently existing medical insurance benefits for the maximum period permitted by law under COBRA or § 38a-538 of the General Statutes at her expense.
13. Each party shall be responsible for his or her own debts as listed in his, or her financial affidavit.
14. The plaintiff shall indemnify and hold harmless the defendant with regard to all joint tax returns filed by the parties and shall pay any deficiency together with interest and penalties, if any. Any refund determined to be due on any joint tax return shall be the property of the plaintiff.
15. The defendant shall retain her 1989 BMW automobile free of any claim or demand by the plaintiff.
16. The plaintiff shall retain his automobiles listed in his financial affidavit free of any claim or demand by the defendant.
17. Except as herein set forth, the plaintiff shall retain all other assets listed in his financial affidavit free of any claim or demand by the defendant.
18. The plaintiff shall contribute the sum of $100,000 towards the defendant's counsel fees and costs, which sum shall be paid on or before October 31, 1998.
Orders shall enter in accordance with the foregoing.
EDGAR W. BASSICK, III JUDGE TRIAL REFEREE